Case No. 12-8488-JMH

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

FILED

APR 17 2012

CLERK, U.S. DISTRIC
SOUTHERN DISTRICT C
EAST ST. LOUIS OF...

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Criminal No. 12-30100-MJR |
| LACEY MARIE STONE, | ) | |
| | ) | Title 18 |
| Defendant. | ) | United States Code, Section 1349 |
| | ) | |

FILED by _____ D.C.

DEC 1 9 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## INDICTMENT

**THE GRAND JURY CHARGES:**

### I. Introductory Statement

1.      Between on or about the 15th day of October, 2007, through at least January,

2010, in St. Clair, Madison, Bond, Clark, Calhoun, Clinton, Crawford, Cumberland, Edwards,

Effingham, Fayette, Gallatin, Green, Jackson, Jefferson, Johnson, Lawrence, Marion, Monroe,

Perry, Pike, Pulaski, Randolph, Richland, Saline, Wabash, Washington and Williamson

Counties, within the Southern District of Illinois and elsewhere, **LACEY MARIE STONE,**

Jennifer Kirk, and others known and unknown, doing business as Universal Marketing Solutions

("UMS") and Creative Vacation Solutions ("CVS"), conducted a telemarketing timeshare resale

scheme targeting timeshare owners throughout the United States and Canada. UMS and CVS

falsely represented that they had found buyers for the consumers' timeshare interests and

solicited fees of up to several thousand dollars from each consumer in purported pre-paid closing

costs and related expenses. The purported sales did not occur, closings were not scheduled as

1

was often represented, and, in fact, UMS and CVS did not successfully sell any consumer's timeshare interest.  UMS and CVS failed to devote substantial resources to marketing their clients' timeshare interest and simply pocketed the purported closing costs, with about a third going to the individual telemarketers who sold the timeshare resale services to the consumer and the balance kept by the owners of the telemarketing company.

2.      Between October 5, 2007 and approximately December 1, 2009, UMS and CVS collected approximately $30 million and victimized approximately 22,219 consumers in all fifty states, the District of Columbia and Puerto Rico; all ten Canadian provinces and the Northwest Territory of Canada.   UMS and CVS victimized at least 54 consumers in at least twenty eight (28) of the thirty eight (38) counties comprising the Southern District of Illinois.

## II. Participants

3.      Universal Marketing Solutions ("UMS") was the initial name under which the timeshare resale scheme operated.   UMS was a registered fictitious name of Hicks, Inc, which was incorporated in 2006 and was located in Palm Beach County, Florida.   The owners of Hicks, Incorporated, were Matthew Hicks, deceased, who was the boyfriend of Jennifer Kirk, and Jennifer Kirk.  Hicks was the President and Jennifer Kirk was the Vice President.   Hicks, Inc, was dissolved in 2009.

4.      Creative Vacation Solutions ("CVS") became the business name under which the scheme operated after Universal Marketing Solutions had lost or was in the process of losing its credit card merchant accounts.  Creative Vacation Solutions was a Florida Corporation based in Palm Beach County, Florida and formed in 2008 ostensibly by S.K., its ostensible owner, the

2

brother of Jennifer Kirk.  In fact, the company was owned and operated by Jennifer Kirk.

5.      UMS and CVS had several sales offices located in south Florida including offices at West Palm Beach, Belvedere, Boca Raton, Okeechobee, Green Acres and Lake Worth.  Some of these offices resembled franchise operations in that they were owned and operated by others, but used the same business name, the same sales pitches and collected money through common credit card merchant accounts.

6.      **STONE** worked for UMS and CVS as an "opener" and "closer" and for a short time was a co-owner/manager of a franchise.  During her time with UMS and CVS, **STONE** was personally responsible for approximately 141 sales aggregating $282,418.86.

### III. The Scheme

7.      Universal Marketing Solutions and Creative Vacation Solutions were names under which defendant and others operated the timeshare resale scam.      Both engaged in a scam intended to deceive consumers into believing that these timeshare resale companies had obtained firm and binding offers from purchasers to buy that consumer's timeshare interest.[1]

8.      A telemarketer referred to as an "opener" would place a cold call to a timeshare owner from lead lists obtained from list brokers.  The opener would ask if the timeshare owner had an interest in selling her timeshare unit.  If such an interest was expressed, then the opener would transfer the call to a "closer." The "closer," frequently described to the consumer as the "inventory manager," would then take over the call from the opener.  Sometimes, before the

---

[1]      As used in this information,"timeshare" refers to a type of fractional interest in real estate in which the owner has the right to occupy particular premises for a specified period of time.  What constitutes a "timeshare"  depends upon the law of the state in which the real estate is located.

closer took over the phone call from the customer, the opener, closer and other telemarketers would discuss the perceived level of desperation of the prospect to sell their timeshare unit. Fees for the illusory services being sold by UMS and CVS would then be jacked up to correspond with the apparent level of desperation. Once the "inventory manager" got on the phone with the prospect, he would tell the prospect that UMS and CVS had one or more "buyers" or "offers" for units in the timeshare resort where the prospects unit was located. Once the customer paid a generous fee of up to several thousand dollars for closing related expenses, the "inventory manager" said that he could "attach" one of the "buyers" or "offers" to the customer's timeshare unit. Telemarketers typically provided a specific closing date sixty to ninety days out and told clients that the closing related expenses they would have to pay would be refunded at closing. Telemarketers then processed charges against the consumers' credit cards and pocketed the money.

9.      In general, the closing date given to customers was made up by the telemarketer. The made up closing date needed to be at least 60 to 90 days from the date of the call. The purpose of the delayed closing date was to postpone when customers would call their credit card companies or banks to complain that they had been defrauded, an inevitable result from their supposed "closing" dates having come and gone without the client receiving the sales proceeds check they had been promised. Delaying that inevitable reporting by the client was important to the success of the scheme, since customer complaints would almost certainly result in charge backs against the company's merchant account and thus jeopardize the ability of the company to process bank card transactions and get paid.

10.    After persuading a consumer to purchase UMS and CVS services,  the telemarketer would then complete an internal sales form with the owner's information, including information on the owner's timeshare interest and asking price, and then transfer the file to a "quality assurance" employee. The  "quality assurance" employee would then place a telephone call to the consumer and make a recording of that part of the call where the consumer gave their oral consent to a charge to the consumer's credit card, debit card, or ACH debit on the consumer's bank account.  During the *unrecorded* portion of the call made to CVS customers, many consumers were read the following:

> First, I will be discussing with you our marketing practices and how we have gotten the offer on your unit and I'll also be discussing with you, *that although we do have an offer of $____*, we cannot legally attach one specific buyer to your unit until we have your free and clear deed and title as well as your signed contract and seller certification back in house.  (Emphasis supplied)

11.    This purported "quality assurance" script contained a blank for the telemarketer to insert a dollar amount for the purported "offer" that CVS had supposedly received on that consumer's timeshare. UMS would generally ask the timeshare owners what they had paid for their units.  The illusory offers for timeshares in that resort would then correspond to an amount roughly twenty five percent higher than a timeshare owner had paid for it.  CVS often filled in the offer amount with the consumer's *asking price* which had been just written by the telemarketer on the form given to the "quality assurance" employee. After telling the consumer that CVS had received an offer on the consumer's timeshare exceeding or approximating their asking price, the  "quality assurance" employee turned on the tape recorder and recorded an acknowledgment by the consumer that the bank card number and expiration date, or bank account information and routing code was correct and that the consumer had agreed to the

5

transaction.  The recorded part of the script contained an acknowledgment by the consumer that they were "authorizing" the company to sell the unit for a particular "sale price," a more ambiguous statement that fell short of the representation that the company had actually received an offer in the amount of the asking price (or a price that exceeded the original purchase price), a representation that had been previously made only moments before in the unrecorded part.

12.      During the recorded part of the "quality assurance" verification, clients were asked to acknowledge that they had not been told that there was a specific buyer for the property. Clients were coached as to how to respond to that question.  They were led to believe that, while there were firm offers and in some cases multiple buyers for their unit, that the company could not "legally attach" the offer or buyer to the property until they had a signed contract.  After all, according to this logic, the company could not sell a timeshare unit *until* it had a signed contract from the client.   It was when they signed their contract (and paid their fees) that the company could "attach" a specific buyer or offer to their timeshare unit.   Thus, it would not have seemed inconsistent for a client to acknowledge during the recording that they had *not* been promised that there was a buyer when in fact that is exactly what they had been promised.   If a client did not follow the script, the call would be terminated, the client re-coached and a new recording begun until the client answered the questions in strict conformance with the company script. Thus, when the customer later complained that they had been promised a closing, UMS and CVS could then retrieve the recording as purported evidence to the client, to the Better Business Bureau, to regulators, and to law enforcement officials, that the company had promised no such thing,

13.     After the customer paid the ostensible closing costs by bank card or ACH debit, CVS would send the customer a contract to sign. Rather than a contract for the sale of the property as had been promised, CVSs contract instead only obligated CVS to provide advertising and marketing services.

14.     As UMS and CVS's unrecorded sales pitch, "quality assurance" procedures and written contracts were constructed, UMS and CVS could claim that marketing and advertising was all that UMS and CVS had ever agreed to provide and that any impression that the consumer may have formed that UMS and CVS had a concrete offer for the customer's unit was a "misunderstanding" on the customer's part.

15.     Despite collecting approximately  $29,320,662.08 from consumers for timeshare resale services, UMS and CVS were not instrumental in selling a single timeshare.  While occasionally desperate timeshare owners expressed interest in abandoning their timeshare interest because of recurring annual fees, and Kirk personally would purchase timeshare units at distressed fire sale prices,  there were substantially no sales at or any where near the full asking price of the seller.  UMS and CVS made no substantial effort to either market or advertise any customer's timeshare interest other than a simple listing on a  website which was made at relatively nominal expense. UMS and CVS made little effort to promote their website and a listing on the website was of no practical value to its customers.

16.     After the promised closing dates came and went without a closing actually taking place, many customers called UMS and CVS to ask about the status of the expected closing. UMS and CVS had telemarketers to respond to these inquiries.   The goal of their customer service operation was to keep clients from reporting the credit card transaction they had entered

into with UMS or CVS as fraudulent to their credit card companies and initiating a charge back against the company's merchant accounts into which receipts from the victims' credit card transactions were deposited. In general, victims were first told that the offer on the victim's timeshare was firm. In subsequent calls to customer service they were then given a number of excuses as to why the closing had not occurred, including the fact that the "maintenance and title report" were still in process, that the buyers were in the process of getting financing, that the buyers were having difficulty getting financing, and that the buyers' financing had fallen through. These statements were false and fraudulent in that UMS and CVS had no buyers, no offers and no interested parties. UMS and CVS maintained a spreadsheet which kept track of the lies being given to their clients in order to avoid providing the same lie twice to the same victim.

17. As complaints against UMS and CVS escalated, and it became apparent that it would be increasingly difficult to do business under the increasingly tarnished name of the respective company, their telemarketers reloaded their existing customers with additional credit card charges in a practice known internally as both "burning down the house" and "doing rentals."

18. "Doing rentals" meant that the telemarketer would recontact customers who had purchased the illusory service and who were expecting imminent closings on their property. The customers were told that the supposed buyers were interested in purchasing additional time in the seller's timeshare development. When the customer reported that she didn't have additional time to sell, the telemarketer told the customer that UMS or CVS had additional time that could be sold to the "buyer" provided that the customer pay for "guest passes," or other fees. Through this bogus mechanism, which was almost always successful, UMS and CVS could collect

additional credit card charges on the victim's credit card account. In truth and in fact, the so called "guest passes" and other fees were a complete fabrication and this purported expense was likewise a total scam.

19.     For a very brief period of time, CVS operated somewhat legitimately. For between a few days to approximately a couple of weeks or more, CVS pitched marketing and advertising services, rather than falsely represent to victims that it had firm offers or buyers for their timeshare interest. Their business essentially evaporated once telemarketers were prohibited from lying to the consumer . They found that relatively few timeshare owners were interested in paying to simply advertise and market their property. They learned that there may be those willing to pay one or two hundred dollars or so to do so, but fewer still are willing to pay thousands of dollars to simply place a listing of the consumer's timeshare interest on a company's website. When CVS attempted to go legitimate, income to individual telemarketers tanked.

20.     Telemarketers who were "openers" and "closers" split about a third of whatever fees they could bilk from an individual customer. Telemarketers who were very successful at UMS and CVS were not so because they were particularly good salesmen. They were successful and made lots of money because they were especially good liars.

21.     The established, proven and highly successful sales pitch that was used by UMS and CVS telemarketers  contained material misrepresentations of fact and misleading statements to prospective customers, including the following:

        A.     UMS and CVS agents falsely represented that their companies had received an offer on the customer's time share. This claim was sometimes embellished by

individual telemarketers to include *multiple* offers on the property. In addition, many consumers were also told that the specific offer that had been received was a "binding" contract and that the purported purchaser "could not back out of it."

        B.     UMS and CVS agents falsely represented that a closing was scheduled on the property often thirty to ninety days hence.

        C.     UMS and CVS agents falsely represented that the fees were for deed and title searches, maintenance profiles, deed preparation, title transfer and for similar expenses.

        D.     UMS and CVS agents variously falsely represented to clients who called customer service that UMS and CVS indeed had an offer or buyer for the property and various made up excuses as to why the closing had not taken place on their timeshare units as promised and represented.

     22.    The representations made in the sales pitch used by UMS and CVS were false and fraudulent in that the offers on the consumer's property were a fantasy, the closing dates were totally make believe, and the purported purpose of the fees a pure invention by the telemarketer. The fees were not being used for closing costs, but were being purloined to enrich the telemarketers and their bosses and pay for the continuing expenses associated with the scam. Only a relatively small amount was going to the cost of listing the property on UMS's and CVSs website, if indeed the consumer's property was even listed there.

     23.    The sales practices of UMS and CVS were false and misleading and both were businesses permeated with fraud in an industry pervaded by deceit.

     24.    Defendant utilized sales scripts that in the circumstances in which they were used created an appearance which was false and deceptive and calculated to induce a false belief as to

the true facts.

25.    In connection with the transactions described in this Indictment, defendant engaged in a scheme involving deceit and trickery in order to gain an unfair and dishonest advantage over victims located in the Southern District of Illinois and elsewhere throughout the United States and Canada.

**IV - Conspiracy**
**18 U.S.C. §1349**

26.    From on or about the 15th day of October 2007  and continuing through at least January, 2010 in the counties of  St. Clair, Madison, Bond, Clark, Calhoun, Clinton, Crawford, Cumberland, Edwards, Effingham, Fayette, Gallatin, Green, Jackson, Jefferson, Johnson, Lawrence, Marion, Monroe, Perry, Pike, Pulaski, Randolph, Richland, Saline, Wabash, Washington  and Williamson Counties,  within the Southern District of Illinois and elsewhere,

**LACEY MARIE STONE**

defendant herein, together with Jennifer Kirk and  various managers of the telemarketing call centers operating under the name Universal Marketing Solutions and Creative Vacation Solutions, and others both known and unknown to the grand jury, did knowingly and willfully combine, conspire, confederate and agree among themselves and each other to commit certain offenses against the United States as follows:

A.    To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations and promises, and for the purpose of executing the scheme, and attempting so to do, to knowingly cause to be sent and delivered by

11

the United States Postal Service and by commercial interstate carrier, mail matter to and from

residents of the United States, including residents of the Southern District of Illinois, to and from

the offices of UMS and CVS in the State of Florida, in violation of Title 18, United States Code,

Section 1341.

    B.  To devise a scheme and artifice to defraud and to obtain money and

property by means of false pretenses, for the purpose of executing the scheme, and attempting so

to do, to knowingly cause to be transmitted by means of wire or radio communication in

interstate and foreign commerce, interstate telephone calls, credit card transactions, electronic

fund transfers, and signs and signals, to and from the offices of UMS and CVS in the State of

Florida, in violation of Title 18, United States Code, Section 1343.

  27.  In furtherance of and as a foreseeable consequence of the conspiracy, UMS and

CVS and its telemarketers caused contracts and other documents to be transmitted by U.S. Mail

or by interstate commercial carrier to the Southern District of Illinois

  28.  In furtherance of and as a foreseeable consequence of the conspiracy, UMS and

CVS and its telemarketers caused interstate telephone calls to be made to the Southern District of

Illinois.

  All in violation of Title 18, United States Code, Section 1349.

  The offense occurred in connection with the conduct of telemarketing, in violation of the

SCAMS Act, punishable under Title 18, United States Code, Section 2326(1).



STEPHEN R. WIGGINTON
United States Attorney

BRUCE E. REPPERT
KATHERINE LEWIS
Assistant United States Attorneys

# UNITED STATES DISTRICT COURT

for the

Southern District of Illinois

| | | |
|---|---|---|
| United States of America<br>*Plaintiff*<br>v.<br>Lacey Marie Stone<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | Case Number: 12-30100-MJR |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     Lacey Marie Stone                                                                    ,
who is accused of an offense or violation based on the following document filed with the court:

☒ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

Count 1 - 18:1349 Conspiracy

Date:     May 1, 2012

_____
*Issuing officer's signature*

City and state:     East St. Louis, IL

Nancy Rosenstengel
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on _____ at *(city and state)* _____ . |
| Date: _____ |

_____
*Arresting officer's signature*

_____
*Printed name and title*

AO 442 (Rev. 11/11) Arrest Warrant MODIFIED SDIL (2/2012)